399 A.2d 1068

**COMMONWEALTH of Pennsylvania**

v.

**Jose J. COLON, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 14, 1977.

Decided March 16, 1979.

316

Eugene V. Alessandroni, Philadelphia, for appellant.

Michael R. Stiles, Assistant District Attorney, Chief, Appeals Division, Philadelphia, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

Following a jury trial concluded on October 12, 1976, appellant was convicted of arson endangering persons [1] and arson endangering property.[2] Post-verdict motions were denied, and appellant was sentenced to a term of imprisonment of ten to twenty years on the arson endangering persons count and a concurrent term of five to ten years on the arson endangering property count. Appellant now argues that the evidence was insufficient to sustain a guilty verdict and that he was denied effective assistance of counsel during trial. Finding no merit in these contentions, we affirm the judgment of sentence.

1. 18 Pa.C.S. § 3301(a).

2. 18 Pa.C.S. § 3301(b).

318

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, *Commonwealth v. Mangini*, 478 Pa. 147, 386 A.2d 482 (1978), the following facts were adduced at trial. At approximately 1:15 p. m. on May 10, 1976, a fire broke out in the first-floor apartment of a three-story building located at 1320 N. Sixth Street, Philadelphia. Gloria S. Rivera (Gloria) resided in the first-floor apartment with her three children. The third floor was occupied by Gloria's sister, Magdalina Rivera (Magdalina), her two children, and Ismael Perez and his wife.

For some two and one-half months prior to the conflagration, appellant had been living with Gloria. During that time, appellant physically abused her, made threats on her life, and threatened to set fire to the building. As a result of these actions, Gloria demanded on May 3, 1976, that appellant leave the house. Appellant acceded and removed himself and his belongings. Two days later, however, he moved back into the apartment and occupied the living room couch. The return was not salutary, and on the evening of May 9, 1976, he beat Gloria with a belt. The next morning, taking advantage of appellant's brief absence, Gloria gathered the children and left the apartment in favor of living with a friend. She mentioned the move, and the friend's name, to Magdalina, but did not reveal the address. During appellant's absence from the apartment, Juanita Gonzales, who resided on the building's second floor, overheard him say to a friend, "I am leaving the block, but I am going to leave the block on fire." N.T. 234.

Returning to the apartment early that same afternoon, appellant discovered Gloria's absence, and asked Magdalina if she knew of her whereabouts. Magdalina refused to divulge any information and appellant took his leave. Some ten minutes later he returned, broke the front door, and again demanded that Magdalina tell him where Gloria had gone. Magdalina remained silent and then accompanied appellant down the stairs, where she left him standing in the first-floor bedroom. Five minutes later, Magdalina descended the stairs and noted appellant bending over the bed,

holding a newspaper, and removing something from his pocket. At this point, Magdalina went to her apartment upstairs, but returned immediately afterward to the first floor. She there saw appellant still in the bedroom which was now rapidly filling with smoke and fire. Magdalina then endeavored to warn the occupants of the building.

In her second-floor apartment, Juanita Gonzales smelled the smoke and ran downstairs where she saw appellant holding a knife. She asked appellant what he was doing, but he replied only, "Get out and shut up." She exited safely and the only injuries connected with the blaze were incurred by Maritza Adorno, a visitor to the third-floor apartment, and Ismael Perez, when both were forced to jump from the third floor to escape the flames.

Approximately forty-five minutes after the blaze started, it was extinguished on the first floor, and Fire Marshall Gerald Dubzak entered the premises to begin an investigation of the fire's cause. On the basis of his findings, detailed more fully below, he concluded that it was incendiary in nature with a point of origin in an area near the bed on the first floor.

Appellant's first contention dealing with ineffective assistance is premised on the following set of facts. On direct examination, Mr. Perez testified that subsequent to his fall from the third story, he received medical aid at a hospital and returned to his uncle's residence, located immediately opposite the burned apartment building. He there met Valentin Alamo, another visitor to the third floor on the day of the fire. At this point of the testimony, appellant's trial counsel interposed an objection and a conference was held at sidebar. In response to a request for an offer of proof from appellant's counsel, the assistant district attorney stated that Mr. Perez was prepared to testify that after he left his uncle, he and Mr. Alamo encountered appellant in a nearby park. An argument ensued during which appellant stabbed Mr. Alamo in the arm and ran from the park. Mr. Perez pursued, and a fight developed between the two until it was halted by the police. Assault charges were filed as a result

of the incident, although the court at that time indicated that the Commonwealth was not proceeding on them.

After hearing this account, the court below opined that evidence of the stabbing and the surrounding circumstances was not relevant to the instant prosecution and would not be admissible. Nevertheless, shortly thereafter, the following exchange took place:

"Q. [Assistant District Attorney]: Did you ever go to the police station to talk to the police?

A. [Mr. Perez]: Yes.

Q. When was that?

A. In the afternoon, when he stabbed my uncle. The Court: I didn't hear that.

The Witness: In the afternoon, when he stabbed—

Mr. Cooper [Assistant District Attorney]: Can we see you at sidebar?

(At this time an off-the-record discussion takes place at sidebar:)

The Court: I didn't understand what the witness said. (Following resumes before the jury:)

Mr. Cooper: The question is withdrawn.

The Court: It is withdrawn and the question is stricken."

N.T. 265.

Appellant argues that his trial counsel was ineffective for not objecting and demanding a mistrial. We cannot agree.

■■■ As always in cases involving claims of ineffective assistance, we are guided by the tenets of *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 235 A.2d 349 (1967):

"We cannot emphasize strongly enough, however, that our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel has *some reasonable basis* designed to effectuate his client's interests. The test is *not* whether other alternatives were more reasonable, employing a hindsight evaluation of the record. . . .

[T]he balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis." *Id.* 427 Pa. at 604–05, 235 A.2d at 352–53 (emphasis in original, footnote omitted).

Further, it is well established that counsel cannot be found ineffective for failing to assert a baseless claim. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977); *Commonwealth v. Goosby*, 461 Pa. 229, 336 A.2d 260 (1975). Applying these principles to the instant case, the question is whether the court would have been required to grant a mistrial had objection been made and a mistrial requested.

In general, admission of testimony which details, or from which the jury may reasonably infer, past criminal conduct on the part of a defendant constitutes reversible error. *Commonwealth v. Martin*, 479 Pa. 63, 387 A.2d 835 (1978); *Commonwealth v. Adams*, 476 Pa. 91, 381 A.2d 882 (1977); *Commonwealth v. Gore*, 262 Pa.Super. 540, 396 A.2d 1302 (1978); *Commonwealth v. DeCampli*, 243 Pa.Super. 69, 364 A.2d 454 (1976). "The purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he is being tried." *Commonwealth v. Trowery*, 211 Pa.Super. 171, 173, 235 A.2d 171, 172 (1967). The courts of this Commonwealth have, therefore, reversed convictions when there have been references at trial to mug shots or other direct or indirect evidence of a prior conviction. *E. g., Commonwealth v. Spruill*, 480 Pa. 601, 391 A.2d 1048 (1978) (witness testified that he buried a couple of bodies for defendant); *Commonwealth v. Turner*, 454 Pa. 439, 311 A.2d 899 (1973) (police officer testified that photograph of defendant was found in police files containing suspects); *Commonwealth v. Scheetz*, 233 Pa.Super. 474, 334 A.2d 707 (1975) (police officer testified that he had requested mug shots of the defendant). There is, however, no per se rule requiring a new trial for every reference of this type. The decision whether to declare a mistrial when faced with these situa-

tions is addressed to the sound discretion of the trial judge. *Commonwealth v. Seigrist*, 253 Pa.Super. 411, 385 A.2d 405 (1978).

▮ Instantly, the circumstances did not mandate declaration of a mistrial. The reference to the stabbing was isolated, immediately stricken from the record, and not emphasized by the assistant district attorney. Moreover, the "he" referred to by Mr. Perez in the statement "when he stabbed my uncle" is never clarified. Nothing in the testimony prior to that point indicates that the witness was referring to appellant.

In this context, an objection would have served little purpose and may well have been detrimental to appellant. If the objection had been refused, as it properly should have been, it would have called needless attention to the remark. The reference itself was vague and there was little worth in magnifying its possible impact on the jury.

A similar situation was presented in *Commonwealth v. Jackson*, 248 Pa.Super. 420, 375 A.2d 168 (1977). In *Jackson*, an undercover agent testified that he noticed appellant's picture in the Scranton Detective Bureau in connection with a previous conviction for burglary. The trial judge refused counsel's request for a mistrial and merely directed the witness to limit his answers to specific responses to the questions. No cautionary instructions were given to the jury, and we agreed with the court below which opined that any ". . . undue reference to it either by way of additional instructions or admonishment would have only exaggerated a very minor problem." *Id.*, 248 Pa.Super. at 425, 375 A.2d at 170. An identical course of action would have been proper in the instant case, and was indeed paralleled by the withdrawal of the question and striking of the answer. We hold, therefore, that any request for a mistrial would have been futile, and counsel's decision not to interpose an objection did not constitute ineffective assistance.

Appellant's second contention is that the trial court erred in admitting the opinion of Fire Marshall Dubzak because it

was not based on his personal observation, or alternatively, in not instructing the jury that such opinion evidence is low-grade evidence. We disagree.

Initially, it is clear that the marshall qualified to serve as an expert witness. Mr. Dubzak testified that he had served as a fire marshall for eighteen months prior to the blaze and as a fireman for seven years before that. He had received in-service training consisting of a thirty-day period of field investigation accompanied by a qualified marshall, together with lectures and other training in determining the cause of fires. In terms of practical experience, he had investigated approximately 1,200 fires and had done preliminary investigations on some 400 cases. The trial court has broad discretion in the matter of expert witnesses, *Laubach v. Haigh*, 433 Pa. 487, 252 A.2d 682 (1969), and such discretion was not here abused.

Substantively, the witness testified that the area near the bed in the first-floor bedroom was the origin point of the fire. This conclusion was based primarily on three facts: the springs of the bed were collapsed; the ceiling level directly above the bed was charred, whereas no other portion of the building exhibited a similar charring; there was fire damage between the portions of the wall, indicating that the hottest point of the fire was in the bedroom and allowed to burn outward. Mr. Dubzak further deduced that the blaze originated with an open flame, that is, a flame initiated by a match, cigarette lighter, blowtorch, etc., rather than by a smouldering cigarette butt. As the marshall explicated, a cigarette would have smouldered for some two to four hours before creating enough heat to support combustion of the entire mattress. The effect of this would have been to leave a deep char on the outline of the bed due to the heat being simultaneously directed down and up. Because such a char was not in evidence, an open flame was indicated. The witness further testified that the permanent electrical wiring was intact, thus militating against the theory that a spark instigated the blaze, and there was no char mark near the receptacle in the room, indicating that the fire's origin was not at that point.

In response to a hypothetical question of defense counsel, however, Mr. Dubzak admitted that it was conceivable that a spark may have ignited a flammable object near the wires, which was then blown onto the bed by a draft, which in turn ignited some flammable material on the bed. He also professed that he was neither aware of the composition of the furniture in the room, nor could he state absolutely the exact time of ignition.

We believe these facts are sufficient to establish the incendiary nature of the fire. Appellant's reliance on *Commonwealth v. Leslie*, 424 Pa. 331, 227 A.2d 900 (1967), and *Commonwealth v. Carthon*, 467 Pa. 73, 354 A.2d 557 (1976), is misplaced. In *Leslie*, the Commonwealth attempted to establish the *corpus delicti* in an arson prosecution prior to the admission of the defendant's confession. The fire marshall produced no tangible facts to substantiate his view that the fire was deliberately set, but could only advance a suspicion of its incendiary nature. Our supreme court held this type of intuitive hunch inadequate to lay a foundation for the confession's introduction. Instantly, we clearly have a conclusion reached from observable facts rather than a mere hunch.

In *Carthon*, a gasoline container emptied on the floor and its contents ignited a short while afterward. The defendant, who was present in the room at the start of the blaze, grabbed another person in the room and exclaimed that he was sorry and didn't mean it. The fire marshall testified that a burning cigarette in a nearby ashtray could have ignited a fire had the gasoline vapor—air mixture been correct, although he was able to virtually eliminate the possibility of static electricity as a cause. In that factual context, we decided that the expert testimony established only that the fire was caused by something other than static electricity, and that it began within a short period of time following the gasoline's discharge onto the floor. Instantly, the chances are far less than those present in *Carthon* that the blaze was accidental. Nor are we presented with the type of ambiguous statement uttered in *Carthon*. We are

here dealing with reasonable doubt, not the possibility of fantastic occurrences, and in these circumstances the evidence was sufficient.

■ Appellant also contends that the jury should have been instructed to receive the testimony of Mr. Dubzak as "low-grade" evidence. No objection was made to this at the time of the court's charge and it was not raised in post-trial motions. It is thus waived. *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

Finally, appellant contends that the evidence was insufficient to sustain a conviction. We disagree.

■ It is well settled that the test for evaluating the sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, the trier of fact could have found that all of the elements of the offense had been established beyond a reasonable doubt. *Commonwealth v. Sero*, 478 Pa. 440, 387 A.2d 63 (1978); *Commonwealth v. Wiggins*, 472 Pa. 95, 371 A.2d 207 (1977). A conviction for arson demands the establishment of three facts: (1) that there was a fire; (2) that it was of incendiary origin; and (3) that the defendant was the guilty party. *Commonwealth v. Leslie, supra* 424 Pa. at 334, 227 A.2d at 902; *Commonwealth v. Nasuti*, 385 Pa. 436, 438, 123 A.2d 435, 436 (1956). The first of these is undisputed and the second established by expert testimony. Taken in the light most favorable to the Commonwealth, the evidence conclusively establishes the third. While it is true that no direct evidence was presented, this has never been a pre-requisite to a conviction for arson. *Commonwealth v. Leslie, supra.* Indeed, it is clear that arson, by its very nature, is rarely committed in the presence of others, and a refusal to convict on circumstantial evidence alone would be tantamount to an invitation to commit the crime.

■ Instantly, Gloria testified that on numerous occasions appellant threatened to burn the house down, and on

the day of the blaze, Juanita Gonzales overheard appellant state that he was going to leave the block on fire. Again, immediately prior to the fire's start, Magdalina observed appellant standing over the bed and reaching into his pocket. This is all consistent with appellant's guilt. Moreover, it cannot be gainsaid that appellant was aware that the building was occupied at the time, having just spoken with Magdalina.

Although appellant characterizes these witnesses as "incredible," it is axiomatic that it is the exclusive realm of the trier of fact to determine both a witness' credibility and the weight to be accorded his testimony. *Commonwealth v. Tillery,* 457 Pa. 466, 326 A.2d 329 (1974); *Commonwealth v. Rambo,* 250 Pa.Super. 314, 378 A.2d 953 (1977). The jury in this case obviously chose to believe the Commonwealth's witnesses. Because its decision is supported by competent evidence, we will not overturn it.

The judgment of sentence is therefore affirmed.

CERCONE, President Judge, concurs in the result.

JACOBS and WATKINS, former President Judges, and HOFFMAN, J., did not participate in the consideration or decision of this case.